## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,  )
           )
     Plaintiff,  )
           )
-vs-          )   Case No. CR-05-036-F
           )
JON KENT RED ELK,   )
           )
     Defendant.  )

## <u>MEMORANDUM OPINION AND ORDER</u>

This memorandum opinion and order memorializes the court's action in granting in part the defendant's second motion in limine (doc. no. 242), filed on October 4, 2005.

I. <u>Procedural history.</u>

The court's action on the defendant's second motion in limine is best understood in light of the procedural history of this case.

On January 7, 2005, the defendant Jon Kent Red Elk, either killed (government's version) Regina Dupler or assisted her to commit suicide (defendant's version).  On February 16, 2005, the Grand Jury indicted Mr. Red Elk for first degree murder under 18 U.S.C. § 1111(a).  Doc. no. 41.  The indictment charges that the defendant, "an Indian, willfully, deliberately, maliciously, and with premeditation, did unlawfully kill Regina Dupler by causing her to suffocate." *Id.*[1]  The indictment was

---

[1] An examination of the issues raised by Mr. Red Elk's defense is obviously beyond the scope of this order.  Suffice it to say, for present purposes, that the court has preliminarily informed counsel of its intent to instruct the jury that assisted suicide is not a defense and that no person is privileged to assist another in committing suicide, but that it will be for the jury to determine

the 41st docket entry in this case, a level of activity at that early stage which certainly foreshadowed things to come. When the indictment was filed, the government's counsel of record were the United States Attorney, Robert G. McCampbell, and Assistant United States Attorney James F. Robinson. Doc. nos. 10, 13.

It was obvious from the outset that both the government and the defendant, in preparing for trial, would rely heavily upon forensic experts in various disciplines. Numerous items of potential evidentiary significance, including a towel, were collected from the residence where Regina Dupler died. Early on, counsel for both the government and the defendant made it clear to the court that each side would rely heavily on expert analysis of evidence gathered from the death scene to support their respective contentions as to the nature and extent of the defendant's involvement in causing Ms. Dupler to die.

The court held an *in camera* hearing with defense counsel and the defendant on March 25, 2005. Minute entry at doc. no. 75. As was discussed with the government's counsel at the scheduling conference which was held a few days later on April 1 (discussed below), the matters which were disclosed in the *in camera* hearing made it even more apparent that, from the defense standpoint as well as from the government's perspective, this case would involve exceptionally intensive use of experts. As defendant's lead counsel, Chief Federal Public Defender Susan Otto, put it at the October 5, 2005 hearing: "To the extent that this jury is going to believe Mr. Red Elk's account, obviously, every piece of forensic evidence that I can collect and

---

whether the defendant participated in bringing about the death of Regina Faye Dupler in the manner he alleges, and, if so, whether the government has nevertheless proven beyond a reasonable doubt that the defendant acted with the intent and the state of mind required by the court's instructions with respect to first degree murder (and as to any lesser included offenses on which the court may instruct).

present to them that tends to substantiate his account is beneficial to him." 10/5 tr. at 20.[2]

Recognizing the expert-intensive nature of this case, then-United States Attorney Robert G. McCampbell filed a motion on April 1, 2005 (doc. no. 96) which proposed a schedule requiring completion of factual discovery by June 1, 2005, delivery of expert reports by June 8, filing of motions other than Daubert motions by June 8, delivery of supplemental expert reports by June 22, filing of Daubert motions by June 24 and responses to Daubert motions by July 8, with trial set for August 8. At the April 1 scheduling conference, it became apparent that, realistically viewing the intensity of the anticipated expert work in the case, both the government and the defendant would need more time to marshal their expert testimony and counter opposing expert testimony than had been contemplated by the government's proposed schedule. Consequently, as shown by the court's April 4 order, the April 1 scheduling conference resulted in an unchanged deadline (June 1) for completion of factual discovery, with later deadlines for expert work, *viz.*, expert reports due July 1, supplemental expert reports due July 15, Daubert motions due July 8, responses to Daubert motions due July 22, and trial set for September 12, 2005. Doc. no. 98 at 1-2.

The September 12 trial setting was the third, but would not be the last, trial setting in this case. *See* doc. no. 44 (trial set April 11), doc. no. 75 (trial set August 8), and doc. no. 98 (trial set September 12).

United States Attorney Robert McCampbell, who had been the government's lead counsel in the case since January 13, withdrew as an attorney of record on May 2, 2005. Doc. no. 123. On the same day, Assistant United States Attorney Sanford Coats entered his appearance (doc. no. 122), with the result that, at that point, the

---

[2] Transcripts of three proceedings are cited or quoted in this memorandum. The transcript of the October 5, 2005 hearing is cited as "10/5 tr." The transcripts of the October 11 and 12 proceedings are cited, respectively, as "10/11 tr." and "10/12 tr."

government was represented by Messrs. Robinson and Coats. Trial preparation proceeded under the scheduling order, with a high level of activity (90 docket entries between April 4 and August 12), but no significant mishaps.

On August 12, the government filed a motion to continue the trial from the September 12 trial date to the October trial docket. Doc. no. 186. The motion was promptly granted, and the case was set for trial on October 11, 2005, which was the fourth trial setting in the case. Doc. no. 197. At that point, all deadlines in the April 4, 2005 schedule had passed.[3]

On August 10, 2005, well after the deadlines for expert reports, supplemental reports and <u>Daubert</u> motions had come and gone, the government submitted two items to analyst Julie Ann Kidd at the FBI laboratory in Quantico, Virginia, for serological and DNA analyses. *See* doc. no. 242, ex. 1, p. RED 1339 ("communication dated August 10, 2005"); 10/5 tr. at 5. The items which were submitted to the FBI lab consisted of a towel (specimen Q 11) and some tape (specimen Q 12). *Id.* (Ms. Kidd was listed by the government as a trial witness and had previously performed analytical work in the case, which had resulted in the production of a report of her earlier work in compliance with the deadlines in the April 4 scheduling order.)

The specimens were received at the FBI laboratory in Quantico on August 12, 2005. *Id.* The towel (referred to in the government's October 3, 2005 letter to defendant's counsel as "the towel, or washcloth," [*see* p. 2, ex. 1 to doc. no. 242]), is the same artifact as that referred to in the government's motion for reconsideration

---

[3] The progress of the case through the completion of the scheduling order events involved an intense level of activity on the part of counsel for both parties as well as the court. As of August 17, when the trial was continued to October 11, the parties had filed 32 motions (not including motions for extension of time and motions for continuance). A number of those motions required extended treatment by the court. *See, e.g.*, orders at doc. nos. 19, 24, 25, 69, 77, 92, 133, 177, 201, 255 and 270. Eight additional motions (other than motions for extension of time, etc.) have been filed since August 17.

(doc. no. 266) as a washcloth.[4]   *See* doc. no. 266, at 2.   The government has represented that "[t]he significance of this item came into consideration after AUSA Sengel was assigned to the case in late August 2005 and began reviewing all case reports and crime scene evidence.   AUSA Sengel believed it was necessary to have the washcloth [towel] analyzed by the FBI for trace evidence."   Doc. no. 266, at 2 (emphasis added).

The government did not inform the court or defendant's counsel that it had initiated a new round of expert work by sending the towel and the tape to Ms. Kidd at the FBI lab on August 10.[5]   Throughout this period, the government was, of course, well aware of the importance which the court and all parties, government included, had attached to expert work and to opportunities for rebuttal or <u>Daubert/Kumho</u> challenges to expert work and opinions based on that work.   Not only did the government not alert the court and defense counsel to the fact that it had initiated another round of expert work (with the consequent possibility that it might be feasible to complete responsive work on an expedited basis, thus avoiding a serious scheduling dilemma), the government waited until October 3, seven days before trial, to provide even a cryptic notification to defense counsel as to the results of this expert work and the gist of the new expert testimony, even though the government, by its own admission, had been aware of the results of Ms. Kidd's additional work at the FBI lab work since "sometime during the week of September 14, 2005."   Doc. no. 266, at 2.

Having had the results of Ms. Kidd's additional lab work in hand since "the week of September 14, 2005," the government provided its notification of the substance of the additional expert testimony to the defendant on October 3.   Doc. no.

---

[4]  The court will, for the sake of consistency, refer to this item as a towel.

[5]  Mr. Sengel entered his appearance as attorney for the government on August 29, 2005. Doc. no. 208.

242, ex. 1.  By this time, with the results of Ms. Kidd's additional lab work in hand, counsel for the government had met with Dr. Jeffrey Gofton, the Chief Medical Examiner for the State of Oklahoma, for the purpose of developing his additional opinion testimony, consisting of "his opinion that if the washcloth [towel] had been in the victim's mouth at the time she died, saliva would have been present on the washcloth due to the nature of the death from asphyxia."  Doc. no. 266, at 2-3.   Dr. Gofton did not examine the towel.  His testimony on this point is based on Ms. Kidd's examination of the towel.  10/5 tr. at 4.

Consequently, with the results of Ms. Kidd's and Dr. Gofton's additional work in hand, and having developed the resultant additional lines of expert testimony, the government's October 3 notification to defense counsel stated as follows, as relevant here:

> In addition, attached is an additional report from Julie Ann Kidd, DNA Analysis Unit I, FBI, regarding her examination of the towel, or washcloth, next to Regina Dupler's head as well as the tape attached. (Bate-stamp nos. RED_1339 to 1341).  An alternate light source was used during the examination and did not glow on the adhesive side of the tape or on either side of the towel or cloth.  The alternate light source did not detect any semen, saliva, mucous, or other fluids.  Ms. Kidd is of the opinion that the DNA detected is probably skin cells.
>
> Further, I anticipate that Dr. Jeffrey Gofton, the Oklahoma State Medical Examiner, will opine that the absence of adhesive or duct-tape fibers on the defendant's knife, the absence of adhesive from the victim's ankles, the apparent absence of saliva or mucous from the washcloth, and the absence of any fibers detected in the victim's mouth are inconsistent with the defendant's version of how Regina Dupler died.

Doc. no. 242, ex. 1.

On October 4, the day after defense counsel received the government's notification of the additional expert testimony which was anticipated from Ms. Kidd and Dr. Gofton, the defendant filed his second motion in limine and alternative motion

for continuance.  Doc. no. 242.  As relevant here, the defendant's October 4 motion made the following points:

– Six months ago, the court set a trial preparation schedule which included provisions for timely discovery of expert findings and <u>Daubert</u> challenges.

– The additional expert findings set forth in the government's October 3 letter were not disclosed until months after the expiration of these deadlines.

– The timing of the government's disclosure effectively forecloses defendant's opportunity to obtain the expert services necessary to analyze the additional expert work or to prepare <u>Daubert</u> motions "challenging the qualifications and reliability of the expert evidence the government proposes to offer."  Doc. no. 242, at 2.

– Dr. Gofton rendered his original report of his findings on February 15, and Ms. Kidd, the FBI analyst, issued her original report on April 13.  Neither report addressed the matters set forth in the government's October 3 notification.

– The timing of the government's disclosure leaves the defense with no time either to challenge or meet the evidence.

Accordingly, the defendant requested that the additional expert evidence be excluded or, failing that, that the trial be continued at least three months, to enable the defense to prepare to meet and challenge the new expert evidence.

II.   <u>Proceedings on October 5, 11 and 12.</u>

The defendant's motion was set for hearing on Wednesday, October 5, six days before the date which had been set for the commencement of jury selection (distribution of the written questionnaires to the prospective jurors).  The government filed its response to the motion on October 4, and the hearing was held as scheduled on October 5.

Early in the hearing, the court asked government counsel why defense counsel were not notified that additional expert work might be forthcoming:

THE COURT:  Okay.  So, apparently, it occurred to the government sometime before the 10th of August that more work would be desirable with respect to the tape and the towel?

MR. SENGEL:  Yes.

THE COURT:  Obviously, that does have some implications in terms of the schedule for expert work that had previously been established long before you were in the case.  At what point did the government try to deal with the scheduling implications of that by informing defense counsel that, well, we may have a little hitch in the schedule, we're going to send the towel and the tape back for more expert analysis?  Did the government ever tell the defense counsel about that?

MR. SENGEL:  No, Your Honor.

THE COURT:  Why not?

MR. SENGEL:  I don't know.

10/5 tr. at 6 - 7.

It was also made clear at the hearing that the towel had been in the possession of the FBI in Oklahoma City continuously from January to August, 2005.  10/5 tr. at 8.  The government could give no reason that the towel had not been sent to the FBI lab in January.  *Id*. at 7.  There was no suggestion that there had been any impediment to timely completion of forensic work with respect to the towel.  *Id*.

The interrelationship between the newly-commissioned work of Ms. Kidd and Dr. Gofton became clear at the hearing.  Dr. Gofton would testify that he would expect saliva to be on the towel if it had been put in the Ms. Dupler's mouth.[6]  10/5 tr. at 3.  Ms. Kidd would testify that she would expect the saliva to be present and detectable

---

[6]  Otherwise stated, Dr. Gofton would "opine that . . . the apparent absence of saliva or mucous from the washcloth . . . [is] inconsistent with the defendant's version of how Regina Dupler died."  Doc. no. 242, ex. 1.

on the towel after it sat in storage at the FBI office in Oklahoma City for eight months. *Id.* at 8, 33.  It is noteworthy that neither the government's October 3 notification of the new expert testimony, nor the September 21 supplemental FBI report that was attached to that letter, included any mention at all of this aspect of the anticipated additional expert testimony from Ms. Kidd.  In other words, it was not until six days before trial and nearly 90 days after the scheduled completion of expert work that defense counsel knew that Ms. Kidd would be the proponent of that proposition.[7]

The arguments at the October 5 hearing brought into high relief the problems presented by the new expert work and the proposed additional expert testimony that had been procured by the government long after the expiration of the scheduling deadlines and then withheld until a week before trial.  Dr. Gofton, the Chief Medical Examiner, had performed a post-mortem examination on Ms. Dupler's body immediately after she died in January, 2005.  He promptly rendered a written report of that examination and had met with counsel for both parties, more or less as a common public resource.  At the October 5 hearing, the court articulated the problem as follows:

> THE COURT:  Let me tell you where I am on Dr. Gofton as a beginning point –
>
> MS. OTTO:  Yes, sir.
>
> THE COURT:  – so that this can guide both counsel.  I think some of Mr. Sengel's arguments in his response resonate well with the Court in terms of Dr. Gofton's core functions as a medical examiner.  He's the Oklahoma medical examiner.  He gets a dead body in.  He or his

---

[7] At the October 5 hearing, Ms. Otto forthrightly acknowledged that Ms. Kidd's September 21 findings "standing alone may be benign."  10/5 tr. at 16.  *See also, id.* at 34.  This concession obviously does not apply to matters not mentioned in Ms. Kidd's September 21 findings (doc. no. 242, ex. 1, p. RED 1339), such as the proposition that she would expect the saliva to remain detectable after eight months.

assistants do a postmortem examination on that body.  In that capacity, he's equally available to both sides.

MS. OTTO:  Absolutely.

THE COURT:  But where I have a problem is when he steps into a realm that is not, at least not obviously within the orbit of his core functions as a medical examiner.  Especially viewed in light of the Court's obligations under Daubert, if he gets off into the realm of criminalistics or whatever you might want to call it and outside of the core functions of the medical examiner, it seems to me that he begins to look and quack like the breed of duck we call an expert witness, whether or not he was retained.

That has implications in terms of the schedule that was very carefully established in this case last spring.  That has implications in terms of the Court's obligations under Daubert.  And the Court's obligations under Daubert cannot be shed by virtue of a scheduling problem.  I have to address Daubert problems one way or another, regardless of when or how they're brought up.[8]  But we do have at least a Daubert issue pop up very prominently when we have a pathologist getting off into some of the areas that it appears it's anticipated he may get off into.

10/5 tr. at 14 - 15.

Defendant's lead counsel, the Chief Public Defender (and a lawyer not known to the undersigned judge to sound false alarms to gain tactical advantage), made it clear that she  saw serious <u>Daubert</u> issues as to the proposed new expert work.  *Id.* at 16 - 18.

---

8  *See, e.g.,* <u>Goebel v. Denver and Rio Grande Western Railroad Co.</u>, 215 F.3d 1083, at 1087 (10th Cir. 2000):  "The district court may also satisfy its gatekeeper role when asked to rule on a motion in limine, on an objection during trial, or on a post-trial motion so long as the court has sufficient evidence to perform "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597.  While the district court has discretion in the *manner* in which it conducts its <u>Daubert</u> analysis, there is no discretion regarding the actual *performance* of the gatekeeper function."  (Emphasis in original.)

At the end of the October 5 hearing, the court concluded that it would be in a much better position to resolve the serious issues raised by the motion in limine if it heard voir dire testimony directly from Ms. Kidd and Dr. Gofton:

> My inclination, but this is not a ruling, it's only an inclination, is to permit Ms. Kidd to testify to her September 21st findings as well as any other admissible testimony she has. I find the situation with Dr. Gofton a bit more problematic. But neither Ms. Kidd's September 21 findings nor Dr. Gofton's additional opinions as outlined in the papers before the Court will be admitted before the defendant is afforded an opportunity to fortify its position on the motion in limine by conducting voir dire examination of both of those witnesses in the presence of the Court, but outside the presence of the jury.
>
> In the case of Dr. Gofton, there are more scheduling possibilities than there are with Ms. Kidd, given her other responsibilities next week before she can even travel to Oklahoma. But I'm not going to either rule on the motion or permit the challenged testimony before defense counsel has had an opportunity to fortify the defendant's position on this motion by conducting voir dire examination of both of these witnesses, as I say, in the presence of the Court and outside the presence of the jury. That, I feel, is important from the standpoint of the Court's comfort level in assessing the issue of prejudice.
>
> And there's no pointed criticism intended here, but we have a failure to comply with the schedule for expert work, which was carefully hammered out last spring and embodied in a scheduling order that was entered on April 4th. That's a serious concern. But my ultimate concern goes to prejudice and the Court's duty to see to it that everyone gets a fair trial.
>
> .   .   .   .
>
> And I learned from Judge Eubanks never to apologize for anything done from this bench, and so I'm not apologizing, but I do hope that the parties have some understanding for a very cautious step-wise approach to this. I think that's in these circumstances essential. I realize you would probably both prefer to have some certainty at this point, I'm not

giving it to you, but I consider a very cautious step-wise approach to this to be essential.

Court will be in recess.

10/5 tr. at 39 - 41.

After the October 5 hearing, the court was notified that Dr. Gofton could be made available for voir dire examination on Tuesday, October 11 (Monday being Columbus Day), but that Ms. Kidd, from the FBI lab, would not be able to travel to Oklahoma City until later in the week.  Accordingly, on October 11, after meeting with the prospective jurors to distribute and explain the written juror questionnaires which had been prepared for the prospective jurors at the request of the parties, the court conducted a further hearing on the defendant's second motion in limine in order to permit counsel to conduct the voir dire examination of Dr. Gofton.

At the outset of the October 11 hearing, the court framed the issues before it as follows:

> I heard arguments and reached some preliminary conclusions, but no final conclusions.  The arguments that we heard last week raised about as many questions as answers.  Although, I would have to say I do have some clarity as to Julie Kidd.  I haven't ruled on anything, but my impression at this point is that the additional factual testimony from Julie Kidd, based on her supplemental report dated September 21st, is probably not in and of itself prejudicial and may, in fact, not even be seriously contested but that it gets very problematic, or at least to some degree problematic, when it is used as a jumping-off point for further testimony by Dr. Gofton.
>
> As to Dr. Gofton, the additional proposed testimony as set forth in Mr. Sengel's October 3rd letter raises questions such as, is it in the nature of expert testimony?  And if so, is it expert testimony on a subject that it outside the core expertise and function of the medical examiner such that the defendant should not be expected to have anticipated that the medical examiner would be expounding on the subject?

And, of course, that ties into the fact that the medical examiner in some ways is a common resource to both sides of the case. And it's my understanding he has, to some degree, been available to both sides of the case.

There's also the issue of whether if it is expert testimony from Dr. Gofton on a subject that is outside of the core expertise and function of the medical examiner, is there any reason to excuse non-compliance with the schedule.

Also, we have the question of whether – even if those issues are resolved against the government, we have the question of whether if the evidence or the new testimony is nevertheless admitted will there be any prejudice? In other words, is the matter seriously in controversy? And does it appear that there would have been an arguable basis for a Daubert exclusion on the basis of a problem either with expertise or methodology? Bearing in mind that this is not a Daubert hearing today, but simply a hearing to afford the defendant to show the Court as best a factual basis for the defendant's second motion in limine as possible.

And also, we have the question of if there is prejudice, is it prejudice based on failure to comply with the schedule or is it based simply on late disclosure of the information? If it's the latter, are we dealing with information that the government should have disclosed earlier under the discovery rules? And are we dealing with information that was equally available to the defense? And, finally, if there is any prejudice, is there any means reasonably available to cure the prejudice?

10/11 tr. at 9 - 11.

Dr. Gofton was called as a witness and testified as advertised.  10/11 tr. at 11 - 38 (pp. 13 and 33 as to the saliva).

At the conclusion of the October 11 hearing, it was clear that four categories of evidence remained at issue:

[The Court:] Number one, again, as it relates to Dr. Gofton, the evidence relating to the absence of adhesive or duct tape fibers on the knife, [2] the testimony relating to the absence of adhesive on Ms. Dupler's ankles,

[3] the evidence as to the absence of saliva or mucous on the towel, and

[4] the testimony as to the absence of fibers in her mouth.

After argument, the government disclaimed any intent to inquire about the adhesive on the knife.  *Id.* at 46.  This left three issues with respect to Dr. Gofton's proposed additional testimony.  As to the proposed opinion with respect to the absence of adhesive on Ms. Dupler's ankles, the court ruled in favor of the government, with some qualifications, concluding that this new opinion testimony would be admitted. *Id.* at 49 - 50.  As to the absence of fibers in the decedent's mouth, the court ruled in favor of the government on the issue of the admissibility of that observation and reserved ruling as to whether Dr. Gofton would be permitted to testify that the absence of fibers in Ms. Dupler's mouth is inconsistent with the defendant's version of how she died.  *Id.* at 52.[9]  As to the proposed testimony about the towel, the court ruled as follows:

> That brings us to the proposed testimony as to the absence of saliva or mucous on the towel.  This, again, is not an issue that quickly and easily resolves itself in the Court's mind.  It is likely that once Dr. Kidd gets on and off the stand, there will be evidence before the jury that – evidence that residue or evidence of saliva was not found on the towel and it may well be that the jury can reach its own conclusion from that.
>
> The Court will exclude testimony from Dr. Gofton that he would expect saliva to be on the towel.  That expectation has clearly been shown to be based on variables sufficient to make it a subject of expert testimony, and under the schedule it simply comes too late.  It will be excluded.

10/11 tr. at 51.

The government had put the defendant in the position, a week before trial, of contending with a newly-disclosed hypothesis, premised on new expert work, that if

---

[9]  The motion was also left pending as to Ms. Kidd (10/11 tr. at 53), because the government could not make her available for voir dire examination until later in the week.

the defendant had acted as he claimed he had, Ms. Dupler's saliva and mucous would have been detectable on the towel eight months after the fluids were deposited on the towel.[10]  Competent defense counsel would, at a minimum, need the time and the resources necessary to ascertain the methodology, factual accuracy and significance of the results of the "alternate light source" test that detected no saliva or mucous on the towel (*see,* doc. 242, exhibit 1, Oct. 3 letter at 1) even though the same examiner found that Ms. Dupler was "the major contributor to the DNA obtained from the [towel – specimen Q11]." *Id.* at RED 1341.  If the no-saliva/no-mucous finding was factually accurate and was made by an individual possessed of the necessary expertise, using valid methods, it would be necessary for competent counsel to inquire into the handling of the towel while it reposed for eight months in the possession of the FBI in Oklahoma City, and to evaluate the possible fate of dried saliva and mucous residue on the towel while being handled and stored by personnel who were oblivious to the fact that the towel would be tested, eight months after the fluids dried, for the presence of even a few milligrams of residue.  The government's position presupposes that it would be reasonable to expect the defendant's counsel to cover all of this ground in the last seven days before the start of a murder trial.  As the court stated at the October 11 hearing, the court concluded that the government's new hypothesis came to late and was disclosed too late.

Jury selection took place as scheduled the next day (October 12).  Early in the day, the government filed its motion for reconsideration.  Doc. no. 266.  The government's motion removed any possible doubt that, although the government had had access to the towel since January, 2005, the additional expert work was

---

[10]  There should be no misapprehension that the government's case would stand or fall with the admissibility of this hypothesis.  This hypothesis would have been but one of numerous arrows in the government's quiver – not the least of which is the fact that the defendant does not deny that he helped kill Regina Dupler –  and it was one that had not previously commanded the attention of any of the attorneys (including the United States Attorney) or FBI agents assigned to the case.

undertaken only because the government's new counsel reviewed the file long after the scheduling deadlines had expired and perceived a new possibility for expert work. *Id.* at 2.  The government asserted in the motion to reconsider (as it apparently intends to assert on appeal) that the testimony about the absence of saliva on the towel was to be "excluded solely because its disclosure was made after the discovery deadline," *id.* at 3, which is obviously a vast oversimplification of a problem created entirely by the government.

After jury selection was completed, but before the jury was sworn, the government announced that it had filed (but did not produce) a notice of appeal and an application to stay proceedings in the district court.  10/12 tr. at 11.  The defendant unequivocally announced that he opposed any delay of the trial.  *Id.* at 13.  As the jury selected by the parties rose to be sworn, the government presented a notice of appeal, which the government twice incorrectly characterized as an order.  *Id.* at 16 - 17.  The court gave the defendant two hours to respond to the notice and to the assertion that the certification in the notice was sufficient to oust the district court of jurisdiction to proceed.  *Id.* at 19.  After the recess, the government made it clear in response to a question from the court that "the singular issue we're talking about is the admissibility of the testimony from Dr. Gofton as to whether he would expect to find saliva residue on the towel."  *Id.* at 34.  The court concluded that the government's filing of a notice of appeal with a certification under 18 U.S.C. § 3731 left it with no choice but to dismiss the jury.  *Id.* at 36.

III.   Analysis.

Citing United States v. Golyansky, 291 F.3d 1245 (10th Cir. 2002), and United States v. Gonzales, 164 F.3d 1285 (10th Cir. 1999), the government asserts that the court should not have granted the motion in limine to exclude the testimony about the absence of the saliva.  Gonzales and Golyansky are relevant (and all of the relevant

cases articulate the same general standard), but the court's analytical beginning point is <u>United States v. Wicker</u>, 848 F.2d 1059 (10th Cir. 1988), and <u>United States v. Russell</u>, 109 F.3d 1503 (10th Cir. 1997), cert. denied, 521 U.S. 1126 (1997), to be followed by a discussion of <u>Gonzales</u> and <u>Golyansky</u>.

The facts of <u>Wicker</u> are materially indistinguishable from the facts of the case at bar.  The government appealed the district court's order excluding testimony and a laboratory report as a sanction[11] for the government's failure to comply with a discovery order.  The government was required to produce a lab report by September 18.  The report was not given to counsel until October 2 as to one defendant and October 5 as to another defendant.  The defendants moved to exclude the report and the testimony of the expert who prepared the report, asserting that the delayed production of the report "did not give [counsel] sufficient time to analyze and rebut either the report or testimony before the trial date." <u>Wicker</u> at 1060.  (A possible <u>Daubert</u> challenge would not have been in issue, because <u>Daubert</u> was decided five years after <u>Wicker</u>.)

The district court heard arguments on the motions to exclude the government's evidence on October 7 and granted the motions on the same day. *Id.*  The trial date was October 13.  Citing the Eleventh Circuit's decision in <u>United States v. Euceda-Hernandez</u>, 768 F.2d 1307 (11th Cir. 1985), the Court of Appeals articulated three factors to consider in addressing a failure by the government to comply with a discovery order:  (1) the reasons the government delayed in producing the materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order, (2) the extent of the prejudice to the defendant as a result of

---

[11]  Some of the cases discuss these issues in terms of "sanctions."  Although this court does not take issue with that terminology, this court did not exclude the evidence in question as a punitive matter – as a "sanctions" frame of reference might imply.  The court's order, and the court's intent, was entirely remedial.

the government's delay, and (3) the feasibility of curing the prejudice with a continuance.[12]  *Id.* at 1061.  The court was careful to note that "these three factors should merely guide the district court in its consideration of sanctions; they are not intended to indicate the bounds of the court's discretion."  *Id.*

The Court of Appeals discussed several facts which were relevant to the district court's resolution of the matter by means other than granting a continuance:  The defendants were prejudiced because the report was produced too late for effective rebuttal efforts, the jury had already been selected and the trial was about to begin, and the district court "had already taken affirmative steps in this case to guarantee prompt and complete discovery, but to no avail."  *Id.* at 1061 - 62.  The district court's management measures had included the imposition of various discovery deadlines. *Id.*  Noting the district court's interest in maintaining "the integrity and schedule of the court even though the defendant may not be prejudiced," *id.* at 1061, as well as the court's "inherent power to control and supervise its own proceedings," *id.*, the Court of Appeals concluded that, in these circumstances, the district court was not required to resolve the matter by granting a continuance, and did not abuse its discretion in declining to do so.  *Id.* at 1062.

Nine years later, in Russell, the Court of Appeals reaffirmed that the trial court has no obligation to require the non-offending party to accept delay as the means of curing the prejudice resulting from the offending party's violations.  Russell, 109 F.3d at 1510 - 11.  Although Russell was not a Rule 16 case (because the violation related to listing of witnesses, not discovery of evidence), the Court of Appeals concluded

---

[12] The Court of Appeals has said that the third factor (continuance) is "essentially irrelevant" where it is clear that the defendant opposes a continuance.  United States v. Ivy, 83 F.3d 1266, 1281 (10th Cir. 1996).  Tempting though it may be to rely on Ivy to obviate the need to consider a continuance, the court does not do so, in part because the Court of Appeals has recently indicated an inclination to read this aspect of Ivy narrowly.  United States v. Ivory, 131 Fed. Appx. 628, 631 (n. 1) (10th Cir. 2005).

that the <u>Wicker</u> analysis should be applied, *id.* at 1511, and that Rule 16(d) "invests the district court with broad discretion in coping with discovery order violations" and provides that one of the measures available is exclusion of the evidence not disclosed. *Id.* at 1510.  The district court's exclusion of the testimony was affirmed.

Read against the backdrop of <u>Wicker</u> and <u>Russell</u>, <u>Gonzales</u> and <u>Golyansky</u> provide little support for the government's assertion that, on the facts of the case at bar, the problem that resulted from its intentional violations of its pretrial obligations should have been solved by granting a continuance.  In <u>Gonzales</u>, the suppression order was reversed in part because the district court's order rested partly on some demonstrably erroneous factual and legal conclusions – such as the conclusion that the defendants had standing to complain of alleged violations of the Fourth Amendment rights of a witness, and the finding that witness statements had been coerced. <u>Gonzales</u>, 164 F.3d at 1291.  The district court's order was not limited to particular testimony – it barred the government from presenting any testimony at all from a key fact witness.  *Id.* at 1289.  It is clear that the Court of Appeals found reversal necessary because, unlike the order in the case at bar, the district court's order in <u>Gonzales</u> imposed "the most severe available sanction, i.e., complete suppression of the witness' statements and trial testimony."  *Id.* at 1292.

In the same vein, the suppression order that was reversed in <u>Golyansky</u> completely barred the testimony of a key fact witness – an exclusion which "would likely require the Government to dismiss thirteen counts."  *Id.* at 1247.  The material that was not timely produced in <u>Golyansky</u> was *impeachment* material (as distinguished from new and untimely expert testimony based on new and untimely lab work), and it was disclosed *nineteen days before trial*.  *Id.* at 1249.  Noting that the district court had made no finding of bad faith, the Court of Appeals observed that "[i]t would be a rare case where, absent bad faith, a district court should exclude

evidence rather than continue the proceedings." *Id.* That formulation, which perhaps is best considered in light of the facts before the court in <u>Golyansky</u>, raises the question of whether the case at bar is a case of bad faith or, absent that, is "a rare case."

A finding of bad faith, especially as to a dedicated prosecutor, is strong medicine, to which this court will not readily resort. His acts and omissions were obviously intentional; he has not claimed ignorance of the scheduling order that was entered four months before he entered his appearance. His failure to forthrightly broach the issue at a time when it might have been resolved with no substantial harm to either party cannot be excused – it bespeaks a willingness to cross the line far enough to assure the frustration of meaningful responsive efforts on behalf of the defendant. And his withholding, until October 3 (one week before trial), of the lab report that he had in hand on September 21 leaves very little room for a finding that he was interested in striking hard blows but not foul ones. <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935).

IV.   <u>Summary and conclusion.</u>

To summarize, from the standpoint of the trial court's responsibility to bring each case to trial fairly and justly while managing the remainder of its docket, the relevant circumstances are these:

1.   Long after the expiration of all deadlines relating to marshaling and challenging expert testimony in an expert-intensive case, the government decides to get a new AUSA involved in the case. The new AUSA reviews the file and conceives a new line of attack,[13] requiring new

---

[13] Any seasoned, resourceful lawyer (which certainly describes Mr. Sengel) who enters his appearance in a complex case in the late pretrial stages will, in short order, have a list of things he wishes had been done by his predecessors. The issue here is whether, in the circumstances confronting the court, those wishes give rise to a unilateral right to impose on the court and a blameless defendant a complete revamping of a carefully-crafted trial preparation sequence which included obligations that devolved upon the government both as a matter of law or because the

expert work, with respect to an artifact (the towel) which had been in the government's possession for nearly eight months.

2.      Without having given the court or counsel for the defendant any notification that new expert work is in progress (which might well have provided a workable opportunity to accommodate the defendant's right to scrutinize and, if necessary, challenge the new expert testimony while preserving the trial scheduling on which the parties and the court had relied), the government waits until seven days before trial to provide a cryptic description of the gist of four new areas of expert testimony, involving two witnesses.

3.      The notification from the government prompts a motion to exclude the new expert testimony.  A hearing on the motion is held six days before trial.

4.      At the hearing and in its motion to reconsider, the government offers no reason for its delay in providing notice of the new expert testimony other than the fact that the testimony relates to a new theory conceived by the new AUSA.

5.      The court, desiring to hear testimony to provide clarification as to some factual aspects of the dispute over the new expert testimony, sets a hearing for that purpose on the day the case had been set for trial.

6.      After hearing testimony and further arguments, the motion to exclude the new expert testimony is granted in part, due predominantly to the fact that the late disclosure, clearly in violation of the scheduling order, effectively precludes meaningful efforts by defense counsel to test the technical merit of the new expert testimony or to marshal the resources necessary to challenge the new expert testimony either by way of a Daubert/Kumho challenge or by way of rebuttal at trial.

---

government willingly assumed them.  (It is also worth noting here that there certainly have been no perceptible deficiencies in the government's preparation of its case.  The government has had the services of veteran trial lawyers, availing themselves of the FBI's full range of investigative and forensic services, from the very beginning of this case.)

7.      The government, taking issue with the court's resolution of a scheduling dilemma which was entirely of the government's making (having been created by the government in the first instance and then exacerbated by the government's inexplicable delay in providing even a cursory disclosure of the results of the new work), invokes its unilateral right to bring the proceedings to a halt by taking an appeal and making the certification required by 18 U.S.C. § 3731.

_____

For the reasons set forth in this memorandum, the relief sought by the defendant's second motion in limine (doc. no. 242) was **GRANTED IN PART, DENIED IN PART** and **RESERVED IN PART**, all as set forth above and in the transcript of the proceedings on October 11, 2005.

DATED October 18, 2005.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

05-0036p079 (pub) .wpd